David Wayne GREEN, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–99–00152–CR.

Court of Appeals of Texas,
Tyler.

Feb. 21, 2001.

Discretionary Review Refused
Aug. 29, 2001.

Rehearing Denied Sept. 14, 2001.

John Michael Head, Athens, for Appellant.

Donna Bennett, Athens, for the State.

Panel consisted of DAVIS, C.J., WORTHEN, J., and GRIFFITH, J.

### OPINION AFTER MOTION FOR REHEARING

DAVIS, Chief Justice.

On November 15, 2000, this Court delivered an opinion affirming Appellant's conviction. Thereafter on December 21, 2000, Appellant filed a motion for rehearing. We overrule that motion, but withdraw our opinion of November 15, 2000, and substitute the following opinion in its place.

Appellant, David Wayne Green, was indicted for the felony offense of capital murder. Appellant pleaded not guilty and was tried before a jury on the issues of guilt and punishment. He was thereafter convicted of capital murder, and punishment was assessed at life imprisonment. Appellant presents seven issues on appeal.[1] We affirm.

#### EXCLUSION OF EXPERT TESTIMONY

In his first issue, Appellant asserts that the trial court erred in excluding expert testimony. At trial, Appellant called Thomas Allen, Ph.D. ("Allen") to testify as an expert regarding the scientific study and analysis of false confessions and the application of that research to Appellant's case. In a pretrial confession, Appellant had made inculpatory statements regard-

---

1. The sufficiency of the evidence is not challenged except with regard to an alleged variance between the names of the victims in the indictment and the names proved at trial.

ing his guilt and sought, through Allen's testimony, to show that they were false.

At trial, Allen testified that he was a psychologist with a doctorate from East Texas State University. However, when Allen was asked about false confessions, the trial court stopped the proceedings and excused the jury. Appellant thereafter advised the trial court that his purpose in calling Allen was to instruct the jury on the "phenomenon called a false confession," and that "there are reasons scientifically why folks give false confessions." The trial court asked Appellant to show him a case where a false confession expert had testified in a criminal case. After a pause to permit Appellant to try to locate such a case (which search was unsuccessful), the trial court held a hearing to "test the rationale of this so-called confession expertise, false confession expertise."

On direct examination by Appellant, outside the presence of the jury, Allen testified that in psychology, there is a concept wherein people who have not committed a crime will nevertheless confess. He testified that the concept of false confessions is scientifically accepted and has been the subject of "extensive and long-time" literature, studies and reports. He indicated that there had been references in literature as early as 1905. Allen also testified that there are studies in "statement analysis," an applied technique for scientifically determining whether or not a confession is valid. He stated that he has studied "quite a bit" but not all of the literature on "statement analysis."

Allen testified that there are three types of false confessions: (1) the internalized confession, (2) the coerced confession, and (3) the voluntary false confession. After studying Appellant's written and taped statements, as well as the statement of Melinda Green, Appellant's ex-wife, Allen stated that he had eliminated the first

category and most of the second and had instead focused on the third. Allen stated that he believes voluntary false confessions are usually given by persons who are mentally ill, have a personality disorder, have an "attention seeking" motivation, or seek to cover some other crime or protect some other person.

Allen then testified to the criteria involved in statement analysis or, as it is also known, statement reality analysis. He stated that there are approximately eighteen criteria involved in such analysis. According to Allen, the first five criteria, coherence, spontaneous reproduction, sufficient detail, contextual embedding, and description of interactions, are the most important. If all five are present, one is probably getting a statement that is reliable and accurate. The presence or absence of the remaining criteria refine the analysis of reliability and accuracy. In applying the major criteria to Appellant, Allen found significant problems in Appellant's statement, indicating that it was not reliable and further found problems in at least six of the remaining criteria. He classified Appellant's statement as a false confession based on the criteria.

On cross-examination by the State, Allen stated that he had never before testified as an expert in false confessions. He stated he was not aware of any other psychologists who had testified as such but knew of experts who had researched and written about it. He stated that there is no formal organization of psychologists with experience in false confessions but many are members of the American Psychological Association's division of law and human behavior. When asked what scientific authorities accept the techniques of statement analysis, Allen named several researchers in the field. He admitted that the application of the criteria is a semi-objective technique by which another per-

son who is familiar with confessions, with the research literature and has clinical experience could reproduce the results. Allen however admitted that he had not spoken with investigators or the polygraph operators who took the statements; he had only reviewed the transcripts of Appellant's statements and may have listened to the audiotapes.

Following examination of the witness, the trial court ruled the evidence inadmissible because (1) there was no case law recognizing such expert testimony, (2) Allen had never testified in this area before, (3) there was "no dedicated certification process for this confession process," and (4) there were "no periodicals dedicated to this process." The trial court further found Allen's opinion to be subjective and "not readily re-produceable [sic]." The trial court held that the issue was one of credibility couched in psychiatric or pseudo-psychiatric terms.

■ Appellant argues that Texas Rule of Evidence 702 permits the introduction of evidence regarding false confessions and its application to Appellant. Appellant relies on the following cases for the proposition that Allen's testimony should have been permitted: *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Nenno v. State,* 970 S.W.2d 549 (Tex.Crim.App. 1998), *overruled in part on other grounds, State v. Terrazas,* 4 S.W.3d 720 (Tex.Crim. App.1999); *Jordan v. State,* 928 S.W.2d 550 (Tex.Crim.App.1996); and *Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App. 1992). Appellant argues that his inability to call Allen deprived him of his constitu-

tional rights to due process, trial by jury, effective assistance of counsel and his rights under Article 1, sections 10 and 19 of the Texas Constitution.[2]

The State responds that Allen's testimony was properly excluded because (1) Allen had never testified on the subject before, (2) no one had ever testified on the subject, (3) Allen was unable to state what scientific authorities accepted the techniques and analysis he used, and (3) the novelty of the theory involved had no sound scientific basis.

■ Any examination of the admissibility of expert testimony must begin with *Kelly v. State,* 824 S.W.2d 568 (Tex.Crim. App.1992). As stated in *Kelly,* the standard of review is whether the trial court abused its discretion in excluding the evidence. *See id.* at 571. Further, as stated in *Kelly,* we must determine if the trial court's decision was "within the zone of reasonable disagreement" given the evidence presented and the requirements of the rule. *Id.* at 574. In conducting this review, we are to defer to the trial judge's assessment of the weight and credibility of the evidence and view the evidence in the light most favorable to the trial court's decision. *Id.*

■ Since the promulgation of the rules of civil and criminal evidence in 1986, Rule 702 has governed the admission of all expert testimony. Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto

---

**2.** Although Appellant claims violation of his rights under both state and federal constitutions, his failure to differentiate between state and federal constitutional grounds on appeal in making his claim of error waives his separate issue under the Texas Constitution, and we address only the federal question. *See Heitman v. State,* 815 S.W.2d 681, 690–91, n. 23 (Tex.Crim.App.1991).

in the form of an opinion or otherwise." *Id.* at 572; *see also* TEX.R. EVID. 702.[3] The "threshold determination" for a trial court to make regarding the admission of expert testimony is whether that testimony will help the trier of fact understand the evidence or determine a fact in issue. *Kelly,* 824 S.W.2d at 572, citing *Duckett v. State,* 797 S.W.2d 906, 910 (Tex.Crim.App.1990). Where the trial court is faced with an offer of expert testimony on a scientific topic unfamiliar to lay jurors, the trial court's first task is to determine whether the testimony is sufficiently reliable and relevant to help the jury in reaching accurate results. *Kelly,* 824 S.W.2d at 572. "Unreliable ... scientific evidence simply will not assist the [jury] to understand the evidence or accurately determine a fact in issue; such evidence obfuscates rather than leads to an intelligent evaluation of the facts." *Id.* citing K. Kreiling, *Scientific Evidence: Toward Providing the Lay Trier With the Comprehensible and Reliable Evidence Necessary to Meet the Goals of the Rules of Evidence,* 32 ARIZ. L.REV. 915, 941–942 (1990). If the trial judge determines that the proffered testimony is reliable (meaning probative and relevant), he must next determine whether that testimony might nevertheless be *un*helpful to the trier of fact for other reasons. *Id.* If the trial judge determines that the proffered testimony is reliable and relevant, he must still decide whether the probative value of the testimony is outweighed by one or more of the factors identified in Rule 403. *Id.*

 Evidence derived from a scientific theory must satisfy the following three criteria in any particular case to be considered reliable: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question. *Id.* at 573. Under Rules 104(a) and (c) and Rule 702 [of the Rules of Evidence], all three criteria must be proven to the trial court, outside the presence of the jury, before the evidence may be admitted. *Id.* Factors which could affect a trial court's determination of reliability include, but are not limited to, the following:

(1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Id.* The burden of persuasion of the reliability of the evidence is on the proponent by clear and convincing evidence. *Id.* citing *Zani v. State,* 758 S.W.2d 233 (Tex. Crim.App.1988).

The Court of Criminal Appeals expressly applied *Kelly* to psychological/psychiatric testimony regarding future dangerousness in *Nenno v. State,* 970 S.W.2d 549 (Tex.Crim.App.1998). In *Nenno,* the court addressed the application of *Kelly* to areas such as psychology and assessment of future dangerousness, stating:

---

**3.** Rule 702 was identical in the Rules of Criminal Evidence and Rules of Civil Evidence and was adopted without change when the two were consolidated into the Texas Rules of Evidence effective March 1, 1998. *See* 61 TEX. B.J. 373, 392 (1998). Unless otherwise specified, all further rule number references are to the Texas Rules of Evidence.

When addressing fields of study aside from the hard sciences, such as the social sciences or fields that are based primarily upon experience and training as opposed to the scientific method, ... [t]he appropriate questions are: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field. These questions are merely an appropriately tailored translation of the *Kelly* test to areas outside of hard science. And, hard science methods of validation, such as assessing the potential rate of error or subjecting a theory to peer review, may often be inappropriate for testing the reliability of fields of expertise outside the hard sciences.

*Id.* at 561.

█ In the instant case, the trial court, expressly and implicitly, found the answers to the three questions set forth in *Nenno* to be in the negative. We agree. As to the inquiries whether the field of false confession expertise is a legitimate one, whether the subject matter of Allen's testimony was within the scope of the field, and whether Allen's testimony properly relied upon the principles involved in the field, our review of the record reveals that when Allen was questioned by Appellant's counsel, he testified that research on the phenomenon of false confessions had spanned many years, but he did not name any authorities in the field. Though Allen testified that there had been books and articles published in the field, he did not name any book, article, or publication of any type. Without further explanation, Allen then launched into a discussion of the principles of the field and how they applied, in his opinion, to Appellant. Given the fact that Allen did not provide the trial court with any actual publications and authorities supporting his analysis, the trial court would have had to assume that the subject matter of Allen's testimony was within the scope of the field to so find. When he was cross-examined by the prosecutor, Allen did provide the names of three "authorities" in the field of false confessions. However, Allen did not testify at any time that he had relied upon or utilized the research or techniques of those same "authorities" when drawing his conclusions about Appellant's confession. After the court's ruling, Appellant offered four documents involving interrogation and interviewing and their application to statement analysis. It appears from the record that the trial court did not consider these articles. The documents appear to be photocopies of pages of some textbook or treatise, but no author, title of the publication, or date of the publication is provided in the record. Furthermore, there was no indication that Allen had relied upon or utilized the research or techniques described in these documents when drawing his conclusions about Appellant's confession. Therefore, these documents were rendered useless for purposes of a *Nenno* analysis.

We hold that Appellant has failed to carry his burden of showing the scientific reliability of Allen's proposed testimony, and, consequently, we cannot say that the trial judge's decision to exclude Allen's testimony was so clearly wrong as to lie outside the zone of reasonable disagreement. *See Kelly*, 824 S.W.2d at 573. Accordingly, we hold that the trial court's decision to exclude the testimony of Allen was not an abuse of discretion. Appellant's first issue is overruled.

### JUROR MISCONDUCT

In Appellant's second and third issues Appellant complains of the trial court's refusal to grant a mistrial after two jurors

were alleged to have committed misconduct. Juror Sarah Carlson ("Carlson") was excused after she had been selected and sworn as a member of the jury but before the alternate jurors had been selected. Juror Carroll Browning ("Browning"), over Appellant's motion for mistrial, was not excused after he had contact with the district attorney's office and read a newspaper in violation of the trial court's instructions.

### Juror Carlson

On January 28, 1999, the trial court held a hearing regarding Juror Carlson's alleged violations of its instructions regarding the reading of a local newspaper and other personal matters. Carlson had been selected as a juror on or about November 24, 1998, and had sworn she would adhere to the court's instructions. After Carlson's testimony, Appellant stated to the trial court that based on her answers, the trial court had no option but to remove Carlson from the jury and moved for such removal. The judge took the motion under advisement, and the following day, it ruled that Carlson should be excused because Carlson was "substantially impaired" based on her answers regarding the newspaper article. Appellant moved for a mistrial because each juror, upon being selected, had been sworn as a juror. The trial court denied the motion.

Appellant contends that the trial court was without authority to continue the trial of the case upon removal of Carlson. Appellant asserts that Carlson had been sworn and the jury impaneled as the trial went along and that the provisions of article 36.29 did not apply to allow an as yet unchosen alternate to move up to take Carlson's place. The State argues that Carlson, having been excused, the trial court was authorized to continue with the trial. The State contends Carlson was not excused under article 36.29 of the Code of

Criminal Procedure as claimed by Appellant but, because the jury was not assembled, dismissal was proper "under the combined authority of Arts. 35.03, 35.16, and 35.19."

Article 36.29, styled "If a juror becomes ill," states in relevant part as follows:

(a) Not less than twelve jurors can render and return a verdict in a felony case. It must be concurred in by each juror and signed by the foreman. Except as provided in Subsection (b) of this section, however, when pending the trial of any felony case, one juror may die or be disabled from sitting at any time before the charge of the court is read to the jury, the remainder of the jury shall have the power to render the verdict; but when the verdict shall be rendered by less than the whole number, it shall be signed by every member of the jury concurring in it.

(b) If alternate jurors have been selected in a capital case in which the state seeks the death penalty and a juror dies or becomes disabled from sitting at any time before the charge of the court is read to the jury, the alternate juror whose name was called first under Article 35.26 of this code shall replace the dead or disabled juror. Likewise, if another juror dies or becomes disabled from sitting before the charge of the court is read to the jury, the other alternate juror shall replace the second juror to die or become disabled.

TEX.CRIM. PROC.CODE ANN. art. 36.29(a, b) (Vernon 1999).

Appellant relies on article 36.29 and cases construing this statute for the proposition that, when the jury has been impaneled and sworn, the only option for the trial court is to declare a mistrial. However, this issue has been decided adversely to Appellant in *Broussard v. State*, 910 S.W.2d 952 (Tex.Crim.App.1995). The

Court of Criminal Appeals, relying on and distinguishing *Williams v. State*, 631 S.W.2d 955 (Tex.App.1982), stated that:

In *Williams*, after the jury was selected but before it was sworn, a venireman became disabled and was dismissed. The defendant moved for a mistrial and for the calling of an entirely new panel. The trial court overruled the motion for mistrial and allowed the parties to select the twelfth juror from a new panel of five taken from the central jury panel. We held in *Williams* that although no statutory provision dealt specifically with the narrow circumstance presented, the trial court was not required to declare a mistrial and the court had authority to complete the jury in the manner employed. Appellant argues that *Williams* provides the only proper remedy when a juror is dismissed after selection and before being sworn.

In *Williams*, no alternate jurors had been selected. The trial court's options were, thus, limited to declaring a mistrial or replacing the disabled venireman from a new panel. In the present case, because an alternate juror was available, the trial court had the further possible option of using the alternate to replace the disabled venireman. Faced with the need to complete the jury, and having no specific statutory directive, the trial court chose an acceptable option by replacing the disabled venireman with a venireman who had already been qualified and accepted by both parties. We find no error in the court's action.

*Broussard*, 910 S.W.2d at 957–58. In the instant case, selection of the initial twelve jurors had ended and alternates were about to be chosen. The trial court proceeded to select an alternate and seat that

person on the jury, much the same as the trial judge in *Broussard*. In the case before us, the trial court did not err in excusing Carlson and selecting an alternate to take her place. Appellant's second issue is overruled.

### *Juror Browning*

██ On the first day of trial, the district attorney reported to the court that one of the jurors had contact with her office in violation of the court's order. The district attorney's secretary[4] testified that juror Browning had twice approached her in the district attorney's office asking for information. The secretary stated that Browning had come into the district attorney's office and approached her asking if she was related to the district attorney and for information about Appellant's case. When he was told that she could not give out information on the case, Browning identified himself as a juror whereupon the secretary advised him that she could not talk to him and he was not supposed to contact the district attorney. He left, but as he did so, she observed him pick up a paper which was open. This paper was produced at trial and entered into evidence, and, after being examined by the trial court, was found to have no stories about the case in it.

After the secretary testified, Appellant moved for a mistrial based on jury misconduct. The prosecutor suggested that Browning be examined. When asked by the trial court if a mistrial was warranted if Browning were to be excused, the district attorney replied that the alternate could then move up. Appellant responded that a mistrial was the appropriate remedy because article 36.29 did not apply where a juror was not disabled. Over Appellant's

---

4. The secretary's name is Deanna Browning. To avoid confusion with the juror in question, we will refer to her simply as "the secretary."

objection, the trial court examined Browning about the incident.

Browning admitted going into the district attorney's office and asking the secretary if she was related to the district attorney. He also admitted picking up the paper, but he adamantly denied that he had read it or that he had picked up the paper for the purpose of reading about the case. He stated that he had not received any outside information about the case from any source and that he believed he had followed the judge's instructions. Browning further denied that anything in the contact with the district attorney or in the paper had influenced him in any way. After examining Browning, the trial court denied the mistrial and the trial continued.

Appellant contends that a mistrial should have been granted because of Browning's violation of the court's orders and that denial of his motion for mistrial was error requiring reversal. The State contends that no jury misconduct occurred and that a mistrial was not warranted by the trial court's retention of Browning.

 We review the trial court's denial of a mistrial under an abuse of discretion standard. *Ladd v. State,* 3 S.W.3d 547, 567 (Tex.Crim.App.1999). Mistrial is an extreme remedy for prejudicial events occurring during the trial process. *See Bauder v. State,* 921 S.W.2d 696, 698 (Tex. Crim.App.1996).

Appellant relies on *Quinn v. State,* 958 S.W.2d 395 (Tex.Crim.App.1997), which states that "[w]hen a juror converses with an unauthorized person about the case, 'injury to the accused is presumed' and a new trial may be warranted." *Id.* at 401 citing *Robinson v. State,* 851 S.W.2d 216, 230 (Tex.Crim.App.1991). However, *Quinn* also states that this is a rebuttable presumption and that an appellate court should defer to the trial court's determination of the historical facts and the credibility and demeanor of the witnesses. *Id.* The facts in *Quinn* are more egregious that those presented here. In *Quinn,* the juror in question actually discussed the case with an outsider. 958 S.W.2d at 397–99. The trial court found that the juror's conversation was not communicated to other jurors and that it had no effect on the verdict or the fairness of the trial. *Id.* at 400. In affirming the trial court and reversing the court of appeals, the Court of Criminal Appeals held that, in viewing the evidence in the light most favorable to the judge's ruling, the evidence supported denial of the appellant's motion for mistrial due to jury misconduct. *Id.* at 402.

In the instant case, the evidence supports the trial court's determination that no juror misconduct occurred. Accordingly, giving proper deference to the trial court, we hold that no abuse of discretion occurred. Appellant's third issue is overruled.

### USE OF PRIOR CONVICTIONS FOR IMPEACHMENT WITHOUT PROPER NOTICE

 Appellant's fourth issue asserts that the trial court erred in allowing the State to use prior convictions for impeachment purposes. The record reflects that Appellant filed his "Request for Notice of Intent to Offer Extraneous Conduct under Rule 404(b) and Evidence of Conviction Under Rule 609(f) and Evidence of an Extraneous Crime or Bad Act Under Article 37.07" on August 18, 1998. By this document Appellant requested notice of the State's intent to use evidence of convictions against him. The document bears a hand-written notation reflecting that the trial court granted the request. Thereafter, at trial, Appellant's counsel advised the court that he intended to call Appellant to the stand, and he asked the trial court

to rule that his prior convictions in North Carolina were inadmissible because the State failed to respond to Appellant's discovery request under Rule 609(f). The trial court asked the State whether it maintained an open-file policy and whether Appellant's rap sheet was in the State's file. The State responded to both in the affirmative and advised the trial court that Appellant's counsel had reviewed the file.

Appellant objected on grounds that an open file policy did not satisfy Rule 609(f), citing *Buchanan v. State*, 911 S.W.2d 11 (Tex.Crim.App.1995). The State pointed out that *Buchanan* is a decision regarding Rule 404(b) not Rule 609(f). The State further argued that, in this case, Appellant was placed on notice of the State's intent to use the prior convictions because they were included in the indictment as what appear to be enhancement paragraphs. The State also stated that it had filed a written notice under Rule 404(b). The trial court initially ruled that the prior convictions would not be admissible to impeach Appellant when he testified.

The following day, however, the State asked the trial court to re-open the Rule 609(f) issue and pointed out to the trial court that under the trial court's standard discovery order, the State had filed its standard response which stated that all of Appellant's convictions were available for inspection in the district attorney's office. The State also referred the trial court to *Cream v. State*, 768 S.W.2d 323 (Tex. App.—Houston [14th Dist.] 1989, no pet.), asserting that because Appellant had not yet taken the stand and testified, by giving him notice that morning, it had given sufficient notice under Rule 609(f).[5] The State further argued that its response to the standard discovery order and the oral ar-

guments the previous day gave Appellant further notice that the State intended to use the convictions for impeachment purposes if he testified. Appellant renewed his objection and argued that receiving notice on the day he was to testify was not reasonable. Following these arguments, the trial court reversed its previous ruling and held that the convictions would be admissible for impeachment purposes only. In light of the trial court's ruling, Appellant indicated that he would not testify.

Appellant argues that the trial court erred in ruling that his prior convictions from North Carolina would be admissible for impeachment purposes under Rule 609(f) because the State failed to provide proper notice as required under that rule. Appellant further contends that the State's standard reply to the discovery order was insufficient. The State replies that its response to Appellant's request under Rule 609(f) was sufficient in that its standard response to the trial court's standard discovery order stated that "[a]ll records of conviction of Defendant" were available for inspection in the district Attorney's office. The State also contends that the Rule 404(b) notice and the written notice provided at trial complied with Rule 609(f).

Rule 609 of the Rules of Evidence states as follows:

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record but only if the crime was a felony or involved moral turpitude, regardless of punishment, and the court determines that the probative val-

---

**5.** The written 404(b) and 609(f) notices provided to Appellant at trial do not appear in the clerk's record.

ue of admitting this evidence outweighs its prejudicial effect to a party.

(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

Tex.R. Evid. 609(a), (b).

▮ In reviewing a trial court's conduct in deciding to permit impeachment with prior convictions, we must accord the trial court wide discretion. *Theus v. State*, 845 S.W.2d 874, 881 (Tex.Crim.App.1992) citing *United States v. Oaxaca*, 569 F.2d 518, 526 (9th Cir.1978). Such a determination should be reversed only upon a showing of an abuse of discretion. *Id.*

The question turns on what constitutes "sufficient advance written notice." In *Johnson v. State*, 885 S.W.2d 578 (Tex. App.—Dallas 1994, no pet.), the Dallas Court of Appeals held that the State had complied with Rule 609(f) when it gave its notice on the day of trial and in advance of the testimony of the witnesses. *Id.* at 581.

In the case cited by the State at trial, *Cream v. State*, the defense counsel asked the trial court to order the prosecutor not to inquire about the appellant's convictions for purposes of impeachment because the State had given no written notice of intent to do so. 768 S.W.2d at 324. The appellate court stated that the clear intent of the rule was to prevent ambushes of defense witnesses with that witness' conviction when the proponent of the witness had not had a fair opportunity to contest the use of such evidence. *Id.* at 326. Where the only convictions about which

questions were asked were already known to the appellant, no ambush occurred. *Id.*

Appellant relies on *Brown v. State*, 880 S.W.2d 249 (Tex.App.—El Paso 1994, no pet.) in support of his claim that reversible error occurred. However, *Brown* is distinguishable in that the appellant in that case was without notice that the prosecution intended to use his prior convictions until *after* he had testified on direct examination. *Id.* at 251. Here, prior notice was given albeit well into the trial. Thus, Appellant's fourth issue is overruled.

### FATAL VARIANCE IN THE NAMES OF THE VICTIMS

Appellant's fifth issue claims a fatal variance between the names of the victims set forth in the indictment and the evidence adduced at trial. The indictment in this case alleges that Appellant intentionally and knowingly caused the deaths of "DAVID JACOBS ... and ... PHYLLIS LYNN WEBB CRITZ ..." by shooting them with a firearm during the same criminal transaction. At trial, Tommie Webb, Phyllis' daughter, testified as follows with regard to Phyllis Lynn Webb Critz:

Q: Do you know Phyllis Lynn Webb Critz?

A: Yes.

Q: How do you know her?

A: She's my mom.

Q: And do you know—Critz, was that a previous married name of your mother?

A: Critz (pronouncing), Critz, yeah.

On cross-examination, Webb testified that her mother had divorced Critz around 1989 and had changed her name back to Webb.

With regard to the other decedent Webb testified as follows:

Q: Did you know Paul David Jacobs, Jr.?

A: Yes, I did.

Q: And what was he usually called?

A: J.R.

Q: How did you know him, J.R.?

A: He was my mom's boy friend.

Webb also identified Jacobs by an autopsy photograph. Later, Joni McLain, M.D., a pathologist, identified the same photograph as a picture of the man on whom she had performed an autopsy. She confirmed that she had performed this autopsy on Paul David Jacobs, Jr. The investigating deputy referred to the victims as "Phyllis Webb" and "Paul Jacobs, Jr." Nowhere in the record is the victim specifically identified as "David Jacobs."

The trial court gave an instruction to the jury regarding the identity of the victims which stated:

> If you find from the evidence, beyond a reasonable doubt, that 'PHYLLIS LYNN WEBB CRITZ' is the same person as 'PHYLLIS LYNN CRITZ' and 'PHYLLIS LYNN WEBB' you may consider the question of whether the defendant murdered the said PHYLLIS LYNN WEBB CRITZ, and say so by your verdict.
>
> Unless you find beyond a reasonable doubt or if you have a reasonable doubt thereof, you may not consider the question of whether the defendant murdered the said PHYLLIS LYNN WEBB CRITZ and you will acquit the defendant of the offense of the murder of PHYLLIS LYNN WEBB CRITZ and capital murder and say by your verdict 'Not Guilty' of the murder of PHYLLIS LYNN WEBB CRITZ and capital murder.
>
> . . .
>
> If you find from the evidence, beyond a reasonable doubt, that 'DAVID JA-COBS' is the same person as 'PAUL DAVID JACOBS, JR.' and the same person known as 'JR' you may consider the question of whether the defendant murdered the said 'DAVID JACOBS.' Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you may not consider the question of whether the defendant murdered the said 'DAVID JACOBS' and you will acquit the defendant of the offense of the murder of 'DAVID JACOBS' and capital murder and say by your verdict 'Not Guilty' of the murder of DAVID JACOBS and capital murder.

Article 21.07 of the Code of Criminal Procedure, styled "Allegation of Name," states as follows:

> In alleging the name of the defendant, or of any other person necessary to be stated in the indictment, it shall be sufficient to state one or more of the initials of the given name and the surname. When a person is known by two or more names, it shall be sufficient to state either name. When the name of the person is unknown to the grand jury, that fact shall be stated, and if it be the accused, a reasonably accurate description of him shall be given in the indictment.

TEX.CODE CRIM. PROC. ANN. art. 21.07 (Vernon 1999).

When a person is known by two or more names, article 21.07 of the Code of Criminal Procedure allows the State to allege either name in the indictment. *Blankenship v. State,* 785 S.W.2d 158, 159 (Tex.Crim.App.1990). In this case, Phyllis's daughter testified at trial that her mother's name was Phyllis Lynn Webb but that she had previously been married and known by the last name of Critz. As such there is no variance between the pleadings and the proof. *See Maldonado v. State,* 998 S.W.2d 239, 248 (Tex.Crim.App.1999).

The issue regarding Jacobs is more problematic. The name of the complainant must be alleged and proved, and a material variance between the name as alleged and the name as proved will render the evidence insufficient to sustain a conviction. *See Grant v. State,* 568 S.W.2d 353, 354 (Tex.Crim.App.1978); *Gayton v. State,* 732 S.W.2d 724 (Tex.App.—Corpus Christi 1987, pet. ref'd) citing *Grant; see also Abu–Shabaam v. State,* 848 S.W.2d 782 (Tex.App.—Houston [14th Dist.] 1993) *vacated on other grounds* 856 S.W.2d 436 (Tex.Crim.App.1993). If the victim's name is spelled differently from that alleged, and the evidence fails to show that the victim is also known by the name in the indictment, the proof will be insufficient unless the name alleged and the name proved are commonly pronounced the same, or if an attentive ear has difficulty in distinguishing between them. *Cox v. State,* 608 S.W.2d 219, 219–20 (Tex.Crim.App.1980). Reversal of the conviction follows if the evidence shows that the names are patently incapable of being sounded the same or that the accused was misled to his prejudice, and a corresponding objection was made at trial. *Flanagan v. State,* 620 S.W.2d 591, 594 (Tex.Crim.App.1981). "The object of the doctrine of variance between allegations of an indictment is to avoid surprise, and for such a variance to be material it must be such as to mislead the party to his prejudice." *Stevens v. State,* 891 S.W.2d 649, 650 (Tex.Crim.App. 1995) *citing Plessinger v. State,* 536 S.W.2d 380 (Tex.Crim.App.1976).[6]

In his brief, Appellant makes no claim that he was prejudiced or surprised in any way by the variance in the names. Absent such prejudice or surprise, the variance claimed by Appellant is not fatal to the conviction. *Reyes v. State,* 3 S.W.3d at 626.[7] Appellant fifth issue is overruled.

### SUPPRESSION OF EXCULPATORY EVIDENCE

In his sixth issue, Appellant complains of the suppression of exculpatory evidence by the prosecutor. Gary Kirkwood, the State's lead investigator, and Melinda Pate, a/k/a Green, Appellant's wife at the time of the murders, testified during the State's case-in-chief that they had not had a relationship of any kind. Further, she specifically denied that she and Kirkwood had gone to a local club together. However, during the defense's case, Appellant presented several witnesses who testified that they had seen the pair at the club and that the pair had a social/dating relationship.

Appellant claims that the prosecutor knew about the relationship between Kirkwood and Pate and failed to correct that false testimony. The evidence at trial

---

**6.** In the following cases, the variance between names was not held to be fatal to the conviction: *Reyes v. State,* 3 S.W.3d 623 (Tex.App.—Houston [1st Dist.] 1999, no pet.) (variance between Trevino and Terrell not fatal); *Scott v. State,* 828 S.W.2d 309 (Tex.App.—Fort Worth 1992, no pet.) ("Shary" as opposed to "Sharon"); *Farris v. State,* 819 S.W.2d 490 (Tex.Crim.App.1990) ("Rosenbahm" versus "Rosebahm"); *Smith v. State,* 734 S.W.2d 694 (Tex.App.—Houston [1st Dist.] 1987, no pet.) (failure to add "Sr." to name in indictment not fatal). *But see* the following cases where the variance was held to be fatal: *Scott v. State,* 905 S.W.2d 783 (Tex.App.—Waco 1995, pet. ref'd) ("Ray" versus "Roy"); *Gilbert v.* *State,* 904 S.W.2d 210 (Tex.App.—Beaumont 1995, no pet.) ("Ronald" versus "Robert"); *Abu–Shabaam,* 848 S.W.2d at 785 ("N. Tomlinson" versus "William Tomlinson"); *Sandoval v. State,* 846 S.W.2d 9 (Tex.App.—Corpus Christi 1992, pet. ref'd) (fatal variance where state proved that Jose Garcia was killed, not Jose Garcia, Jr., as alleged in the indictment); *Gayton v. State,* 732 S.W.2d at 726 ("Porfino" versus "Porfirio").

**7.** On appeal, Appellant does not contend that he did not kill the persons named in the indictment.

showed that the prosecutor and her investigator had confronted Kirkwood about the relationship after receiving information about it from Dr. Hood, Melinda's former employer. Appellant argues that this violated the prohibitions against non-disclosure of exculpatory evidence as set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and calls for reversal. The State responds that it was not guilty of suppression of exculpatory evidence because it had no evidence to "surrender" to Appellant until it came out at trial. The State further asserts that because Appellant has not shown that the evidence was so favorable that it would make the difference between conviction and acquittal, reversal is not required.

 Suppression by the prosecution of evidence favorable to the defense after the defense has asked for the same violates the defendant's right to due process where the evidence is material to guilt or punishment, irrespective of the good faith of the prosecution. *Brady v. Maryland*, 373 U.S. at 86–87, 83 S.Ct. at 1196–197. In determining whether failure to disclose such evidence is error requiring reversal, we rely on a three-part test: (1) if there has been a failure to disclose evidence, (2) if that evidence is favorable to the accused, and (3) if that evidence creates a probability sufficient to undermine the confidence in the outcome of the proceeding. *Thomas v. State*, 841 S.W.2d 399, 403–04 (Tex.Crim.App.1992). The answer to the first of these issues is in the affirmative. The State knew of the relationship and allowed Kirkwood and Melinda to testify falsely regarding its existence. The answer to the second issue is likewise in the affirmative. It is favorable to the accused in that it impeaches the credibility of the witnesses. The last issue, however, must be answered in the negative. Kirkwood's relationship with Melinda came out

in Appellant's case-in-chief through numerous witnesses who showed that Kirkwood and Melinda had not been completely forthcoming in their answers while on the stand. Had it not come out at trial, the answer might be different. However, the jury had the opportunity to judge these witnesses' credibility in reaching their decision. We hold, therefore, that the evidence does not create a probability sufficient to undermine the confidence in the outcome of the proceeding. Appellant's sixth issue is overruled.

### DENIAL OF A COMPLETE REPORTER'S RECORD

Appellant's final issue claims that he was denied a complete record of the trial because the record does not contain a transcription of the hearing wherein juror Carlson was excluded. Appellant's brief was filed May 8, 2000. On July 18, 2000, the reporter's record of this hearing was filed with this Court. Appellant's claim is moot and his seventh issue is overruled.

The judgment of the trial court is *affirmed.*